```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
OF A FEATHER, LLC,                     :
                                       :
                       Plaintiff,      :
                                       :          19cv9351 (DLC)
             -v-                       :
                                       :
ALLEGRO CREDIT SERVICES, LLC,          :
                                       :
                       Defendant.      :
                                       :
-------------------------------------- :
                                       :
ALLEGRO CREDIT SERVICES, LLC,          :
                                       :
                       Plaintiff,      :          20cv2622 (DLC)
                                       :
             -v-                       :          OPINION AND
                                       :          ORDER
OF A FEATHER, LLC, JARED STAMELL, and  :
SUSAN STAMELL,                         :
                                       :
                       Defendants.     :
                                       :
-------------------------------------- X
```

APPEARANCES:

For plaintiff/defendant Of a Feather, LLC and defendants Jared
Stamell and Susan Stamell:

Andrew R. Goldenberg
Goldenberg Law, LLC
345 Seventh Avenue, 3rd Floor
New York, NY 10001

Jared Bennett Stamell
Stamell & Schager, LLP
146 Quenames Road
Chilmark, MA 02535

For defendant/plaintiff Allegro Credit Services, LLC:

Sean J. Bellew
BELLEW, LLC
2961 Centerville Rd., Ste 302
Wilmington, DE 19808

DENISE COTE, District Judge:

This Opinion presents the Court's findings of fact and conclusions of law following a March 16, 2021 bench trial.  For the reasons stated below, Allegro Credit Services, LLC ("Allegro") is granted judgment on its breach of contract claim against Of a Feather, LLC ("Feather"), Jared Stamell ("Stamell"), and Susan Stamell.

## Background

In these related cases, Feather alleges that Allegro breached a loan commitment agreement that required it to loan Feather $6,912,500.  The loan was not extended and Feather now seeks $496,097.15 in damages.  Allegro, in turn, alleges that Feather breached that same agreement by failing to pay the required fees.  Allegro now seeks $550,000 in damages.

Feather sued Allegro for damages in state court and Allegro removed Feather's action (the "Original Action") on October 9, 2019.  On March 27, 2020, Allegro filed its own action against Feather (the "Related Action").  Feather asserted counterclaims against Allegro in the Related Action.

An Opinion of July 14, 2020 granted in part Allegro's motions to dismiss the Original Action and the counterclaims that Feather filed in the Related Action.  Of A Feather, LLC v. Allegro Credit Servs., LLC, No. 19CV9351 (DLC), 2020 WL 3972752 (S.D.N.Y. July 14, 2020).  As a consequence, the only remaining claims are the competing breach of contract claims.  Feather's amended complaint ("Amended Complaint") seeks damages in the amount of $58,500 on its breach of contract claim.  The breach of contract counterclaim that Feather asserts against Allegro in the Related Action, however, seeks $417,960 in damages.  Allegro's complaint seeks damages in the amount of $555,000 on its breach of contract claim.

Following the conclusion of discovery, the parties filed a joint pretrial order on February 22, 2021 for this bench trial.[1] Feather filed its proposed findings of fact and conclusions of law on February 24; Allegro did so on March 1.  Allegro provided the Court with the affidavits constituting the direct testimony

---

[1] In their contract, the parties waived their right to a jury trial.  It provides: "BORROWER AND LENDER EACH HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, COUNTERCLAIM, OR CROSS-CLAIM ARISING IN CONNECTION WITH, OUT OF, OR OTHERWISE RELATING TO THIS LOAN COMMITMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATION, THE COLLATERAL, OR ANY RELATED TRANSACTION."  Moreover, the parties did not request a jury trial by September 11, 2020, the deadline set by the Court for such a request.

of its witnesses and the exhibits which constitute its evidence in chief on March 4; Feather did so on March 4 and 12.

A bench trial was held on March 16.  With the parties' consent, the trial was conducted in accordance with the Court's Individual Practices.  As noted, in advance of the March 16 trial date, the direct testimony of the witnesses under the control of the parties was presented through affidavits. Feather presented the affidavits of its attorney for the underlying transaction, Janine Rayano, Esq.; Susan Stamell, Feather's guarantor on the Loan Commitment; and her husband Stamell, Feather's owner and another guarantor for Feather on the Loan Commitment.[2]  Allegro presented an affidavit from Daniel Gordon, the manager and principal of Allegro.  Each of these witnesses appeared at trial and was available for cross-examination.  The factual findings are principally set forth in the first section below but appear as well in the discussion section.

---

[2] Feather gave notice that it had subpoenaed its financial consultant and mortgage broker for the transaction, Renato Muzii, to testify as a witness at trial.  The day before the trial, however, Feather notified the Court that it would not call Muzii as a witness.

### Findings of Fact

Feather owns a sixty-five acre farm on Martha's Vineyard in Chilmark, Massachusetts (the "Property").  Stamell, an attorney, owns and manages Feather.

On March 16, 2005, Stamell borrowed $7 million from American Home Mortgage Acceptance, Inc., a loan that was secured by a mortgage on the Property.  As of March 27, 2019, the total amount due on the loan was $9.6 million, which reflected the unpaid principal balance of over $7 million, accrued interest, escrow advances, deferred principal balance, and default related fees and charges.

By 2018, Ocwen Loan Servicing, LLC ("Ocwen") held the mortgage and offered Feather a discount of $4,161,803.25 if Feather refinanced the mortgage.  This required Stamell to secure financing of at least $5.5 million.  Muzii worked with the Stamells to find the financing.

In January 2019, Feather and Allegro began negotiating a loan for the refinancing of the mortgage on the Property.  The Stamells were in dire financial circumstances and Allegro understood that.  On February 4, Allegro issued a Letter of Interest to Stamell.  On February 13, Feather made a payment of $20,000 to Allegro.  This "Initial Fee" served as the inducement

5

for Gordon to enter negotiations of a loan commitment agreement with Feather.

In early March, Ocwen threatened Feather with foreclosure on the Property.  The Stamells paid Ocwen $136,000 to forestall foreclosure proceedings.  A March 15 agreement between Stamell and Ocwen required the refinancing to occur by March 27, 2019 if Stamell were to receive the discount and forestall foreclosure.

Beginning on March 8, Feather and Allegro exchanged drafts of a Loan Commitment.  On March 20, Gordon sent Rayano and Muzii an email stating, "Jared [Stamell] will need to find the $15,000 since we won't go out of pocket for attorneys fees and closing costs.  We have already back-ended more of our fee than we would typically consider."  He noted as well that Allegro had "run up very small legal fees thus far."

On March 21, Allegro sent Feather the final version of the loan commitment agreement ("Loan Commitment").  In the Loan Commitment, Allegro agreed to loan Feather $6,925,000 for a one-year term at an interest rate of 11%.  The Loan Commitment provided that the closing "shall take place not later than April 2, 2019, <u>time of the essence</u>.  The <u>time of the essence</u> date was included at the insistence of [Feather] who has represented that it will be in a position to meet all requirements contained herein by said date."  (Emphasis in original.)

The Loan Commitment also required Feather to pay a Commitment Fee of $575,000 with the Loan Commitment.  It noted that

> This Loan Commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this Loan Commitment, duly accepted by [Feather], accompanied with the payment to Allegro of a commitment fee in the amount of Five Hundred Seventy Five Thousand Dollars ($575,000) which is non-refundable and earned for, among other things, the commitment to provide funds ("Commitment Fee").

The Loan Commitment explained that Allegro had "no obligation with respect to the Loan unless and until this Loan Commitment is fully executed and received by [Allegro] along with the Commitment Fee."

Through a provision labeled Commitment Fee Modification, however, Allegro gave Feather two options regarding payment of the Commitment Fee.  It could pay the remainder of the Commitment Fee of $555,000 ($575,000 minus the $20,000 Initial Fee) when it signed the Loan Commitment, or it could pay Allegro another $20,000 when it signed the Loan Commitment and pay the remainder of the Commitment Fee -- $535,000 -- at closing.

Also of importance to this dispute, the Loan Commitment required Feather to pay $10,000 to Allegro's attorney at the time it executed the Loan Commitment.  It also imposed on Feather the duty to "pre-pay to [Allegro's] attorney, reasonable

legal fees and expenses of [the] attorney for services provided to [Allegro] in connection with this transaction."

The Loan Commitment contained a limitation on Allegro's liability for damages.  It provided that Allegro "SHALL HAVE NO LIABILITY" to Feather or any other person for "ANY AMOUNT IN EXCESS OF THE PAID PORTION OF THE COMMITMENT FEE."

The Loan Commitment was an integrated contract.  It provided:

> No Oral Modifications:  Notwithstanding any course of dealing between the parties, no amendment, modification, rescission, waiver, or release of any provision of this Loan Commitment shall be effective unless the same shall be in writing and signed by Borrower and Lender.

Stamell executed the Loan Commitment on Feather's behalf on March 22, 2019.  Jared and Susan Stamell each signed the Loan Commitment individually and as guarantors.  Allegro executed the Loan Commitment on March 25.  That same day, Susan Stamell transferred $15,000 to Allegro via a Chase bank wire transfer.

Thus, as of March 25, the Stamells had paid Allegro $35,000.  Allegro contends that Feather owed Allegro an additional $5,000 as part of its obligations under the Commitment Fee Modification and owed Allegro's attorney $10,000 in attorney's fees.

In an email sent on March 26 at 10:07 a.m., Feather's attorney, Rayano, asked if Allegro would permit the funds

destined for Ocwen to be held in escrow by Allegro's attorney
while Feather gathered all the necessary title documents.  She
acknowledged that this was a "big 'ask'".  Rayano made these
requests because the Ocwen mortgage had to be paid by March 27.
Allegro responded that there were too many open issues to permit
a "closing in escrow" at that time and that Allegro had not yet
formally retained its attorney.  Among the several outstanding
issues Allegro listed were the fact that Feather "has not funded
the legal fees required by the Commitment Letter."  It was in
response to that observation that Rayano stated, "Got it.  Is
there any circumstance where you can postpone the 10K to closing
and take it from there.  Another big ask."  She added that
Stamell understood that he had to provide other missing items
"asap".  Allegro responded that it would contact its attorney,
but that it thought "these items need to be addressed before
anyone spends any more money on this debacle."

Losing confidence that it could provide Allegro with the
missing documentation and the required funding, Feather
contacted counsel for Ocwen on March 29 and got a further
extension until April 10 to pay Ocwen.  The Allegro loan to
Feather never closed.  Muzii told Allegro that the Stamells had
found a better deal.

On April 3, Feather asked Titan Capital ID, LLC ("Titan") to refinance the mortgage.  On April 4, Feather and Titan executed a loan commitment agreement.  Titan loaned Feather $7,275,000 on April 10 at an interest rate of 13.5%.  The Titan loan was paid off in 2020.

## Discussion

The parties do not dispute that the Loan Commitment is an enforceable contract.  They also agree that the Loan Commitment is unambiguous.  Despite that agreement, they dispute what performance it required of the parties.  They also dispute the amount of damages that either Feather or Allegro can receive if it were to prevail.

In order to establish a claim for breach of contract under New York law,[3] a plaintiff must prove: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted).

---

[3] The Loan Commitment provides that it "shall be governed by and construed in accordance with the internal substantive laws of the State of New York, without regard to the choice of law principles of such state."  Moreover, the parties' briefs assume New York law controls.  "[W]here the parties agree that New York law controls, this is sufficient to establish choice of law." Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011).

I.   Feather's Performance Under the Loan Commitment

Allegro contends that Feather failed to pay $15,000 that was due as of the date it executed the Loan Commitment and that Feather thereby defaulted on its obligations under the Loan Commitment.  Allegro further contends that this default excused its own performance.  Allegro is correct.  And, because Feather has not shown that it performed under the Loan Commitment, its own breach of contract claim fails.[4]

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties."  In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017).  If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law for the court.  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006).

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous."  In re MPM Silicones, 874 F.3d at 795.  "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its

---

[4] The Loan Commitment's Limitation of Damages clause would in any event limit the damages Feather could recover from Allegro to the $35,000 it paid Allegro.

11

terms." Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.,
924 F.3d 32, 41 (2d Cir. 2019) (citation omitted).

> An ambiguity exists where the terms of the contract
> could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated
> agreement and who is cognizant of the customs,
> practices, usages, and terminology as generally
> understood in the particular trade or business.

Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595
F.3d 458, 466 (2d Cir. 2010) (citation omitted). A contract is
unambiguous, by contrast, if its "language has a definite and
precise meaning about which there is no reasonable basis for a
difference of opinion." Keiler v. Harlequin Enters. Ltd., 751
F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter
or go beyond the express terms of the agreement, or to impose
obligations on the parties that are not mandated by the
unambiguous terms of the agreement itself." Torres v. Walker,
356 F.3d 238, 245 (2d Cir. 2004) (citation omitted). In
interpreting contracts, "words should be given the meanings
ordinarily ascribed to them and absurd results should be
avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104
(2d Cir. 2006) (citation omitted). Additionally, "[a]n
interpretation of a contract that has the effect of rendering at
least one clause superfluous or meaningless is not preferred and

will be avoided if possible." LaSalle Bank Nat. Ass'n v. Nomura
Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation
omitted).

The Loan Commitment unambiguously required Feather to make
three payments before or as of the date it executed the Loan
Commitment.  First, it required Feather to make an initial
payment of $20,000, which would be credited against the $575,000
Commitment Fee.  The Loan Commitment provides:

> This Loan Commitment and all of its terms and
> conditions will become effective only upon . . .
> payment to Allegro of a commitment fee in the amount
> of Five Hundred Seventy Five Thousand Dollars
> ($575,000) which is non-refundable and earned for,
> among other things, the commitment to provide funds
> ("Commitment Fee").  Allegro acknowledges having
> received Twenty Thousand Dollars ($20,000) from
> Borrower which sum has been applied toward the balance
> due on the Commitment Fee.

Second, the Loan Commitment required Feather to pay to
Allegro's attorney fees in the amount of $10,000 upon signing
the Loan Commitment.  The Loan Commitment states:

> Borrower agrees upon signing of the Loan Commitment to
> forward Ten Thousand Dollars ($10,000) to Lender's
> legal counsel, on account of legal fees and costs.

Third, as noted above, the Loan Commitment became effective
if Feather paid a Commitment Fee of $555,000 ($575,000 minus the
$20,000 initial payment) with the delivery of a copy of the Loan
Commitment executed by Feather.  The Loan Commitment, however,
also contains a Commitment Fee Modification.  Under the

Modification, Feather could pay an additional $20,000 no later
than March 22 and delay the payment of balance of the Commitment
Fee (that is, $535,000) until the closing.  The Modification
provides:

> Notwithstanding the above requirement to pay the
> Commitment Fee at the signing of this Loan Commitment,
> as consideration for the parties unconditionally and
> irrevocably waiving all right to trial by jury and the
> parties agreeing to the Choice of Forum and Limitation
> of Damages clauses, Lender will accept payment of the
> Commitment Fee in the following manner:
>
> > a) Twenty Thousand Dollars ($20,000) to be paid
> > at the time this Loan Commitment is signed, prior
> > to our due diligence, which signing will be no
> > later than March 22, 2019, time of the essence;
> >
> > b) Five Hundred Thirty Five Thousand Dollars
> > ($535,000) to be paid at the closing from the
> > Loan proceeds or upon Borrower electing not to
> > proceed to a Loan closing.  In addition, any
> > default by Borrower under this Loan Commitment,
> > or other failure of Borrower to comply with this
> > Loan Commitment, or misrepresentation by Borrower
> > of any fact or state of facts to Lender either in
> > connection with this Loan Commitment or
> > otherwise, or any material adverse change of any
> > type shall not relieve Borrower of its obligation
> > to pay such amount to Lender.

These three payments total $50,000.  Feather only paid
$35,000 of the $50,000.  Feather paid Allegro $20,000 prior to
the signing of the agreement.  On March 25, Feather paid Allegro
through the Chase wire transfer $15,000 of the $20,000 due at
the signing of the Loan Commitment.  Finally, Feather did not
pay Allegro's legal counsel the $10,000 it owed.  By failing to

14

perform its obligations under the Loan Commitment, Feather breached the parties' contract.  Accordingly, Allegro was relieved of its obligation to fund the loan.

Feather admits that it only paid $35,000 to Allegro. Feather argues, however, that it only had to pay Allegro $35,000 as of the time it executed the Loan Commitment.  It contends that it only had to make one payment of $20,000, which it did in February.  And, even though the Loan Commitment refers to a $10,000 legal fee, Feather says that the legal fee was in fact $15,000, and that it paid that as well on March 25.  Feather's argument is at odds with the plain and unambiguous terms of the Loan Commitment and at odds as well with its attorney's email of March 26 to Allegro confirming that the legal fee was $10,000 and had not been paid.

Feather's argument that it only had to make one payment of $20,000 rests on its construction of the Commitment Fee Modification, which is quoted above.  Feather contends that the phrase "Notwithstanding the above requirement to pay the Commitment Fee at the signing of this Loan Commitment, . . ." replaces the Acceptance of Commitment provision.  Feather's argument relies on CNH Diversified Opportunities Master Acct., L.P. v. Cleveland Unlimited, Inc., for the principle that:

> When a preposition such as "notwithstanding any other provision" is included in a contractual provision,

that provision overrides any <u>conflicting</u> provisions in
the contract.

36 N.Y.3d 1, 16 (2020) (emphasis supplied).

Feather's argument fails.  The Commitment Fee Modification
and the Acceptance of Commitment provisions do not conflict with
one another.  The Commitment Fee remained $575,000.  The
Commitment Fee Modification allowed Feather to defer until the
closing the payment of $535,000 of the total Commitment Fee of
$575,000 if Feather made a second payment of $20,000 at the time
it executed the Loan Commitment.  Only with two payments of
$20,000 (that is, $40,000) was the Commitment Fee of $575,000
reduced to $535,000.

Rayano has testified that the $15,000 paid to Allegro was
for legal fees for its counsel.  This testimony is mistaken.  It
is inconsistent with the terms of the Loan Commitment and with
her email exchange with Allegro on March 26.  Moreover, the
$15,000 payment was arranged by Susan Stamell with Chase bank on
March 25 and went to Allegro and not its attorney.  There is no
credible evidence that this payment, which was in excess of the
$10,000 in legal fees set forth in the Loan Commitment, was an
overpayment of the legal fees.  In any event, if it were a
payment of legal fees, Feather failed to pay any of the $20,000
it owed to Allegro to obtain a delay in making a full payment of
the Commitment Fee at the time it executed the Loan Commitment.

Feather emphasizes that the March 20 email from Gordon to Muzii and Rayano requested $15,000 since Allegro did not want to be out of pocket for attorney's fees and closing costs.  Feather contends that the March 25 payment of $15,000 to Allego was in satisfaction of that request.  The March 20 email does not set forth the terms of the Loan Commitment.  The parties continued their negotiations.  The terms of their final agreement are set forth in the integrated contract dated March 21 and executed by Feather on March 22.

Feather argues that its construction of the Loan Commitment is supported by a paragraph in the motion to dismiss Opinion. In that Opinion, the Court denied Allegro's motion to dismiss Feather's breach of contract claim.  Of A Feather, LLC v. Allegro Credit Servs., LLC, No. 19CV9351 (DLC), 2020 WL 3972752 (S.D.N.Y. July 14, 2020).  Allegro had argued that it was undisputed that Feather breached the contract, and therefore Feather could not enforce the contract against Allegro.  Because there were disputed issues of fact regarding Feather's compliance with the contract terms, Allegro's motion to dismiss was denied.  To the extent that the Opinion discussed Feather's duty to pay the Commitment Fee, that discussion did not engage with the issue now before the Court -- whether the Loan Commitment unambiguously required Feather to pay $40,000 of the

17

$575,000 Commitment Fee as of its signing of the Loan Commitment.

II.  Allegro's Performance Under the Loan Commitment

To prevail on its breach of contract claim, Allegro must prove that it fully performed its obligation under the Loan Commitment.  Under that document, Allegro was relieved of its duty to fund the loan when Feather failed to pay $15,000 of the $50,000 due on or before the execution of the Loan Commitment.

The Loan Commitment provides:

> This Loan Commitment may be terminated by Lender and the Commitment Fee retained and earned by Lender in the event of the following:
>
> > (i) If Borrower shall fail to comply with any of the terms or conditions hereof.

The Loan Commitment unambiguously states that Allegro could terminate the agreement if Feather failed to comply with any of its obligations.  Accordingly, once Feather failed to make the required preliminary payments, Allegro was entitled to cancel the Loan Commitment and decline to fund Feather's refinancing of the Property.

Feather argues that Allegro nonetheless breached the implied covenant of good faith and fair dealing in failing to fund Feather's refinancing.[5]  "Under New York law, implicit in

---

[5] Feather did not plead such a claim in its Amended Complaint or in its counterclaims against Allegro.

every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included." Spinelli v. Nat'l Football League, 903 F.3d 185, 205 (2d Cir. 2018) (citation omitted).  The implied covenant of good faith and fair dealing includes a promise that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." Id. (citation omitted).

It is well established, however, that "the implied covenant of good faith and fair dealing cannot be used to impose an obligation that is inconsistent with express contractual terms." In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d Cir. 2015).  That is, it may not be used to "defeat[] a right that a party actually bargained for." Spinelli, 903 F.3d at 206.

Feather bases its implied covenant claim on Allegro's failure to prepare closing documents, to retain legal counsel, and to close by the agreed upon date.  This claim is duplicative of Feather's breach of contract claim and based on the same set of facts.  Both claims fault Allegro for failing to close the promised loan, and both are defeated by Feather's failure to

uphold its own obligations under the Loan Commitment.  Feather's implied claim is redundant of its breach of contract claim, without merit, and is denied.[6]

III. Allegro's Damages

Allegro claims that it is entitled to a damage award of $672,060.99.  That figure includes the $540,000 unpaid balance of the Commitment Fee, the $10,000 that Feather failed to pay to Allegro's legal counsel, and prejudgment interest.

The provision of the Loan Commitment that made Feather liable for any unpaid balance of the Commitment Fee is best understood as a liquidated damages clause.  New York law provides that a liquidated damages clause is enforceable when "the specified amount is a reasonable measure of the anticipated harm."  U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 71 (2d Cir. 2004).  "A provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced."  Agerbrink v. Model Serv.

---

[6] Feather's claims for damages are also excessive in light of the Loan Commitment's express limitations on the amount of damages that Feather can recover from Allegro for any breach.  While Feather argues that the limitation provision is unenforceable because Allegro acted in bad faith, Feather has not shown that Allegro acted in bad faith at any point.  The evidence is that Feather was in desperate financial condition and abandoned its agreement with Allegro to obtain a loan from Titan that it considered to have more favorable terms.

LLC, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (citing Priebe & Sons v. United States, 332 U.S. 407, 413 (1947); see Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc., 393 N.Y.S.2d 365, 361 (1977).

Liquidated damages are "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." Trustees of Columbia Univ. in City of New York v. D'Agostino Supermarkets, Inc., 36 N.Y.3d 69, 74-75 (2020). "A liquidated damage provision has its basis in the principle of just compensation for loss." Id. at 75. "Liquidated damages that constitute a penalty, however, violate public policy, and are unenforceable." Id. A contractual provision that imposes damages that are "grossly disproportionate to the amount of actual damages provides for [a] penalty and is unenforceable." Id. (citation omitted). The party seeking to avoid payment of liquidated damages bears the burden of establishing that they "were disproportionate to the foreseeable losses and in fact, a penalty." Id. (citation omitted).

Allegro bases its claim for the full amount of the Commitment Fee on the following provisions in the Loan Commitment. First, it relies on the Commitment Fee Modification, which provides:

21

> [A]ny default by Borrower under this Loan Commitment,
> or other failure of Borrower to comply with this Loan
> Commitment, . . . shall not relieve Borrower of its
> obligation to pay such amount to Lender.

Second, Allegro relies on a provision in the Loan

Commitment that states

> In the event of any default during the term of this
> Loan Commitment, Lender may, at its option, require
> immediate payment of the balance of the Commitment Fee
> and Lender may terminate the Loan Commitment and
> retain the paid portion of the Commitment Fee.

These two provisions are unenforceable liquidated damages

clauses.  Allegro has not shown that the full amount of the

Commitment Fee bears any relationship to any actual damages

suffered by Allegro.  Rather, the provisions are plainly

intended as a penalty and an "added spur to performance."

Priebe, 332 U.S. at 413.  Accordingly, they cannot serve as a

basis for a damages claim by Allegro.

Finally, Allegro notes that the Loan Commitment provides

that the "Commitment Fee is not refundable under any

circumstances, except as agreed to herein."  It further provides

that the Commitment Fee may be "retained and earned" by Allegro

if Feather should "fail to comply with any of the terms or

conditions" of the agreement.

Allegro may retain the portion of the Commitment Fee that

Feather already paid.  That amount is not so high as to be

untethered to any actual damages that Allegro suffered from

22

expending effort on this ultimately futile venture. Accordingly, Allegro can retain the $35,000 that Feather paid to Allegro.

As part of its damage award, Allegro also seeks to recover the $10,000 in legal fees that Feather was required to pay to Allegro's legal counsel.  The Loan Commitment provides that "Borrower agrees upon signing of the Loan Commitment to forward Ten Thousand Dollars ($10,000) to Lender's legal counsel, on account of legal fees and costs."  Allegro cannot recover these unpaid legal fees.  Allegro has submitted no evidence that it ever incurred any legal expenses in connection with this transaction.

IV.  Guarantors

Allegro seeks recovery from Feather's guarantors of any amount it receives in damages through its breach of contract claim against Feather.  Having awarded Allegro the $35,000 paid by Feather toward Feather's Commitment Fee, Susan and Jared Stamell are similarly bound by that award.

"A guaranty is a promise to fulfill the obligations of another party, and is subject to the ordinary principles of contract construction.  Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro, 25 N.Y.3d 485, 492 (2015) (citation omitted).  "Guaranties that contain language

obligating the guarantor to payment without recourse to any
defenses or counterclaims, i.e., guaranties that are 'absolute
and unconditional,' have been consistently upheld by New York
courts." Id. at 493.  "Absolute and unconditional guaranties
have in fact been found to preclude guarantors from asserting a
broad range of defenses." Id.; see id. (listing defenses
including fraud in the inducement, discharge in release, and the
statute of limitations as examples of precluded defenses).

The Loan Commitment contains a guaranty clause ("Guaranty
Clause").  It provides:

> The Guarantors, jointly and severally, absolutely and
> unconditionally, guaranty the prompt payment to
> Allegro, . . . of the Commitment Fee together with any
> other obligations of the Borrower incurred pursuant to
> this Loan Commitment (collectively, the
> "Obligations").  This is a guaranty of payment and not
> of collection and is an absolute, unconditional,
> primary and continuing obligation and will remain in
> full force and effect until the Obligations are paid
> in full by the Borrower or the Guarantors.  Each
> Guarantor . . . waives all defenses, legal and
> equitable, otherwise available to the Guarantor.

Jared and Susan Stamell each signed the Loan Commitment
"Individually and as Guarantor."  The Guaranty Clause is an
explicit "absolute and unconditional" guaranty.  Accordingly,
Jared and Susan Stamell are liable for the obligations that
Feather incurred under the Loan Commitment.  Allegro is entitled
to judgment in the amount of $35,000 as to Jared and Susan
Stamell as guarantors of the Loan Commitment.

24

V.    Pre-Judgment Interest

Allegro seeks prejudgment interest from April 1, 2019 at a rate of 11%.  Under New York law,[7] a plaintiff that prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right.  14 N.Y. C.P.L.R. § 5001(a); New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 603 (2d Cir. 2003).  In New York, prejudgment interest at a rate of 9% per annum is calculated "from the earliest ascertainable date the cause of action existed."  N.Y. C.P.L.R. §§ 5001(b), 5004.

Because Allegro is not awarded any damages beyond the monies it received in 2019, an award of prejudgment interest is not appropriate.  Allegro has had the full use of the $35,000 since it received those funds.

---

[7] "In a diversity case, state law governs the award of prejudgment interest."  Schipani v. McLeod, 541 F.3d 158, 164 (2d Cir. 2008).

## Conclusion

The Clerk of Court shall enter judgment in these consolidated cases for Allegro jointly and severally against Feather, Jared Stamell, and Susan Stamell in the amount of $35,000 and close this case.  Allegro may retain the $35,000 that Feather already paid it but may not recover any additional money.

Dated:   New York, New York
         March 18, 2021

                              _____
                                        DENISE COTE
                              United States District Judge